WILLIAM WOODVILLE & OTHERS *vs.* SETH REED, LEVI EASTON & OTHERS ; and, J. PHILIP ROMAN *vs.* WILLIAM WOODVILLE & OTHERS.

PLEADING AND PRACTICE IN EQUITY : CHECK AS EVIDENCE OF PAYMENT : EVIDENCE : EQUITABLE SUBSTITUTION : MORTGAGE, MORTGAGOR, MORTGAGEE : ASSIGNMENT OF MORTGAGE.—The bill of complaint of W. W. et al., alleged that the firm of R. E. & Co. being indebted to the complainants in about $50,000, in the month of June, 1856, gave them and other creditors their promissory notes, endorsed by H. E., the payment of which was extended eighteen or twenty months from

July, 25th, 1856, and most of which when due were not paid; that on the 11th of August, 1856, L. E., one of the said firm, executed and delivered to H. E. a mortgage of certain real estate to indemnify him on account of his endorsements, to the benefit of which they were entitled to be substituted; that they have since discovered that prior to the mortgage of indemnity, on the 13th of May, 1856, for certain feigned considerations, L. E. conveyed by way of mortgage, all the property described in the first mentioned mortgage to H. E., who, on the 23rd of February, 1857, assigned the same to J. D. R., to whom, on the 24th of the same month, L. E. and H. E. executed a deed of trust of all the same property, with power to sell and convey the same and pay first the mortgage of May; secondly, to pay all other liens and incumbrances according to their legal priorities; thirdly, to pay all other debts of L. E.; and fourthly, to pay the surplus, if any, to said L. E. The bill charged that the mortgage of May 13th was fraudulent and void, and prayed the same might be set aside, and the premises sold to pay the debts of the complainants, and for a discovery of the consideration of said mortgage and of its assignment. The answer of H. E., admitting the execution of the mortgages, states the mortgage of August to have been made to indemnify him as endorser of the notes of R. E. & Co. for fifty or sixty thousand dollars, and that of May the 13th, to secure the re-payment of a loan of $15,000. The answer of J. D. R., making the same admissions, avers that he became the *bona fide* purchaser of the mortgage of May 13th, paid the mortgagor, by check, the full and fair valuation agreed upon, took the assignment as purchaser and placed it on record. A supplemental bill filed by the complainants charged that J. D R. was not a *bona fide* purchaser for valuable consideration, without notice, but that the consideration was insufficient and illegal, and the assignment colorable with notice of the equities of the complainants, the prayer being similar to that of the original bill. The answers to the supplemental bill denied all fraud, and repeated in substance more at large, the averments of the original answers. There was a general replication to the answers and testimony taken. HELD:

1st. That the answers considered merely as pleadings, put the complainants upon the proof of all the allegations material to the relief prayed.

2nd. Where a first answer states the general result of the transactions between the assignor and assignee, and a second answer sets forth the mode of payment, and discloses the particulars by which that result is effected, the answers are not to be considered as involving such contradiction as to deprive them of their legal effect, in throwing the burden of proof upon the complainants.

3rd. That a check given *bona fide* on a banker having funds to pay it, is *prima facie* payment in this State if accepted as cash. The subsequent suspension of its payment in consequence of the filing of a bill to set aside as fraudulent a mortgage, in consideration of the assignment of which the check is given, does not cancel the check, but where there is an express agreement with the payee to that effect, postpones its payment until the validity of the mortgage is established.

4th. That the brief interval between the assignment to J, D. R., and the execution of the deed of trust to him by L. E. and H. E. is not alone sufficient to overcome the positive denials of the answers, that the trusteeship was not a

part of the original arrangement, and contemplated at the time of the execution of the former.

5th. So also with regard to the alleged intent to protect the property from attachment of the creditors of H. E., imputed by the bill and expressly denied by the assignee; there being no evidence to overcome the answers these allegations remain unproved.

6th. There is not sufficient evidence to subject the assignee to the equitable liens which would have existed against the assignor, if the first mortgage had remained in his hands undisposed of for a valuable consideration.

7th. The claim of the complainants to be substituted to the benefit of the indemnity given by the second mortgage, in priority to the first, as against the assignee, J. D. R., is not established.

8th. That an endorser or surety holding a mortgage for indemnity may, whilst solvent, for a *bona fide* consideration, assign the mortgage, but when insolvency ensues, the mortgagee's interest in the property is made to yield to the superior equity in favor of the creditors for whom he is surety.

9th. That in the present case, the assignment being complete before the assignee was notified of the claims of the complainants, and the insolvency of the assignor not being established at the date of the assignment, the claim of J. D. R. should be allowed.

AGENCY,—AGENT: PRACTICE IN EQUITY.—The claim of J. P. R., in the above recited proceedings, arises on certain notes of R. E. & Co., endorsed by H. E., amounting to $19,023.13, including interest, purchased pending said proceedings, and filed by J. P. R. in his own right. The claim was excepted to on the ground that the said notes were a portion, or renewals of a portion, of the notes endorsed by H. E., which were designed to be protected by the mortgage of L. E. to H. E., and were purchased by J. P. R., as agent of H. E., who being liable for their amount, is not entitled to dividends as a creditor.—HELD:

That the exceptions to this claim are ruled good and the claim rejected.

APPEAL from the Circuit Court for Baltimore city.

The appeals in these consolidated cases are taken from the orders of the Court below, (ALEXANDER, J.,) in the first case appealed from, ratifying certain accounts, allowing J. Dixon Roman the amount of his mortgage claim, and a further order rejecting the allowance in said accounts to J. Philip Roman for his claims as purchaser of certain promissory notes. The substance of the pleadings, and the facts of these cases are so fully stated in the opinion of this Court as to render a further statement of them here unnecessary.

The causes were argued before Bowie, C. J., and Bartol, Goldsborough and Weisel, J.

*J. Shaaf Stockett* and *S. T. Wallis*, for Woodville and others, argued:

1st. That the assignment to J. Dixon Roman of the mortgage of May 13th, 1856, was not made *bona fide*, and that even if *bona fide* the consideration money was not paid by Roman until after he had notice of *lis pendens* in this case, by service of process upon him, and when he could have absolutely protected himself, as he in fact did, by countermanding his check for the money. It will, therefore, be maintained that he stood in no better position as against the equities of these complainants than Easton, and may be decreed against, if a purchaser at all, as a purchaser *pendente lite*, and as Easton might have been. The complainants, as holders of the notes endorsed by Hezekiah Easton, for which he was indemnified by the mortgage of August 11th, 1856, are entitled, it will be argued, to be substituted to the benefits of said indemnification in priority to Easton's mortgage of May 13th, 1856, for his individual debt, and in equal priority against Roman, as against Easton, himself, said Roman not being a *bona fide* purchaser for value. *Merritt vs. Northern R. R. Co.*, 12 *Barbour*, 605. *Muller vs. Bohlens*, 2 *Wash. C. C. Rep.*, 378. *Patten vs. Moore*, 32 *N. Hamp.*, 382. *Jewett vs. Palmer*, 7 *John. Ch. Rep.*, 65. *Inloes vs. Harvey*, 11 *Md. Rep.*, 519. 1 *Story's Eq. Jurisprudence*, secs. 502, 638. *Eastman vs. Foster*, 8 *Metcalf*, 19, 23. 26 *Vermont*, 308, which adopts the above case. *Bank of the U. S. vs. Stewart*, 4 *Dana*, 27. *Ware vs. Otis*, 8 *Greenleaf*, 387. *Curtis vs. Tyler*, 9 *Paige*, 432, 435. *Ten Eyck vs. Holmes*, 3 *Sandford Ch. Rep.*, 428. See, also, 20 *Conn.*, 443, and 29 *Conn.*, 42, 43.

2nd. That J. Philip Roman is not entitled to receive a dividend in these cases upon the notes of Reed, Easton &

Co., filed herein by him, because the same were purchased by him at fifty cents in the dollar, as the agent of, and for the benefit of, Hezekiah Easton, who was liable as endorser for their payment, and have been thus paid and satisfied to the lawful holders thereof, by or on account of said Hezekiah, and are now in law and equity extinguished, especially against these complainants.

*G. W. Dobbin* for J. Dixon Roman and J. Philip Roman—

Maintained the correctness of the ruling of the Court below as to the claim of J. Dixon Roman. He argued also, that J. Philip Roman being the holder of the notes, filed by him, with the usual probate, attesting under oath his ownership of them, he must be taken to be their true and lawful owner, and as such, entitled to the dividend upon them, unless it be clearly shown that he is not such owner, and that there was no proof whatever to establish such absence of ownership in him, or any participation in their ownership by Hezekiah Easton.

BOWIE, C. J., delivered the opinion of this Court.

The cases of *Woodville et al., vs. Reed, Easton, J. Dixon Roman et al.,* and *Woodville & Others vs. Reed, Price & Others,* in the Circuit Court for Baltimore city, were consolidated by an order of the 15th of April, 1862.

Subsequently accounts N. & O. were filed, in the former of which the appellee, J. Dixon Roman, as assignee of a mortgage, was allowed his claim in full, and the appellant, J. Philip Roman, as holder of certain notes, dividends "pro rata" out of the residue of proceeds in both accounts.

These accounts were ratified by orders of the 11th of March, 1864, (except as to the claims of J. Philip Roman,) which were rejected. Woodville and others appealed from the ratification and all anterior orders or decrees allowing

J. Dixon Roman's claims.    J. Philip Roman appealed from the rejection of the dividends assigned him.

Originating in the same transactions, and being embraced in the same record, these appeals have been argued together and will be disposed of successively in the same opinion.

The nature of these claims will better appear from a compendium of the bill and proceedings in the several cases.

On the 10th of March, 1857, the complainants and appellants, Woodville and others, as creditors of the firm of Reed, Easton & Company, filed their bill against the firm, (consisting of Seth Reed, Levi Easton and William Burgess, of the city of Baltimore,) and Hezekiah Easton, of the State of Pennsylvania, and J. Dixon Roman, Esq., charging that the firm being indebted to the complainants in about $50,000 or $60,000, on or about the month of June then past, did agree to give, and did deliver to them and other creditors, their promissory notes endorsed by Hezekiah Easton, the payment of which was extended eighteen or twenty-four months from the 25th of July, 1856, and most of which when due were unpaid.

They further charged, that after the execution and delivery of the notes, on the 11th of August, 1856, Levi Easton executed and delivered to Hezekiah a mortgage of certain real estate to indemnify him on account of his endorsement, to the benefit of which they were entitled to be substituted; that they have since discovered that prior to the mortgage of indemnity, on the 13th of May, 1866, for certain feigned considerations, Levi Easton conveyed by way of mortgage, all the property described in the first mentioned mortgage, to Hezekiah Easton, who afterwards, on the 23rd of February, 1857, assigned the same to J. Dixon Roman, Esq., to whom, afterwards, on the next day, the 24th of the same month, Levi and Hezekiah made and executed a deed of trust of all the same property, with

power to sell and convey the same, and pay, first, the mortgage of May 13th, 1856; secondly, to pay all other liens and encumbrances according to their legal priorities; thirdly, to pay all other debts of Levi Easton; and fourthly, to pay the surplus, if any, to said Levi.

They charged that the said mortgage was fraudulent and void, prayed the same might be set aside, and the premises sold to pay the debts of the complainants, and that the defendants might answer and make full discovery in regard to all the matters alleged, particularly in regard to the consideration of the mortgage of the 13th of May, 1856, etc., and the consideration for its assignment.

Pending these proceedings, on the 1st of May, 1857, it was agreed between J. Dixon Roman, trustee, and one of the defendants in the above cause, and the solicitors of the complainants, that the trustee should proceed to sell all the property conveyed to him in trust by Levi Easton and Hezekiah Easton, and report the same to the Court, and the money arising from said sales should be subject to the final decision of the cause, as the property would have been if unsold. That if the said deed of trust shall be finally decreed to be void, then the trustee shall bring into Court the whole proceeds of sales (after deducting costs and expenses incurred,) to be paid to the parties entitled, and he shall not claim, or be allowed, any commissions as trustee; otherwise, he should be allowed, and the residue distributed to the persons entitled.

The answer of Hezekiah Easton, after admitting the execution of the mortgages of May and August, 1856, and that the latter was made to indemnify him as endorser of the notes of the firm of Reed, Easton & Co., to a very large amount—between fifty and sixty thousand dollars—as to the consideration of the first mortgage, says, all the stocks, bonds and securities therein mentioned, were in fact loaned to the firm in the vain hope of enabling said firm to main-

tain its credit and obligations, the firm expecting to be able to use them, but being disappointed in that respect, the stocks were returned ; as to the cash loaned, being the sum of fifteen thousand dollars, as recited and secured by said mortgage, he avers, in April or May, 1856, he received from his brother, Levi, most urgent solicitations to aid him in sustaining the firm, which he represented as in serious danger, and he immediately borrowed from the Hagerstown Bank and other banks in that region large sums of money, and went to Baltimore and paid over to his brother the said sum of fifteen thousand dollars.

Mr. J. Dixon Roman's answer to the original bill, filed on the 13th of November, 1857, after admitting the execution of the mortgages, states, that as president of the Hagerstown Bank, the respondent knew that Hezekiah Easton borrowed from that bank five or ten thousand dollars in April or May, 1856, and he was informed and believes he obtained a like sum from two neighboring banks, which loans he understood were designed to aid Levi Easton, his brother, in sustaining the house of Reed, Easton & Co., which was in a tottering condition, etc. That in the fall of 1856, the respondent heard from the friends of Hezekiah that he was deeply involved in debt of his own, and in liabilities for his brother, to a serious amount, and knows his credit was thereby much impaired, and his facilities for obtaining discounts materially diminished. That in December last, and again in January, Hezekiah applied to him to borrow a large sum of money on judgment binding his land in Pennsylvania, which respondent refused. Again in February he made another application and produced the first mortgage, dated May 13th, 1856, and was willing as to that part which secured the repayment of the $15,000 to pledge it as security or to sell it absolutely.

The respondent refused to loan, but finally agreed to purchase if he should find on examination that it was a

just incumbrance or clear title. The following week they met in Baltimore, and the title proving satisfactory, the respondent "then and there finally and *bona fide* paid to him the full and fair valuation agreed upon, and took the assignment as purchaser, and placed it upon record. Seeing that a trustee must be eventually appointed to sell the mortgage premises, the said Levi and Hezekiah, the next day, vested in the defendant the full legal title to it, by executing the deed of trust mentioned in the bill, and thereby conveyed all the property to be sold, etc.

The appellants, on the 3rd of May, 1858, filed their supplemental bill, charging that J. Dixon Roman was not a *bona fide* purchaser for a valuable consideration without notice, but that the consideration was insufficient and illegal, and the assignment colorable with notice of the equity of the complainants and others, and prayed he might discover the true consideration, how and when paid, and that they might have the same relief as prayed in the original bill, and the mortgage and assignment might be declared void.

The answer to the supplemental bill, after denying all fraud charged or imputed, responding to the interrogations, what was the actual amount of the consideration given or promised to be given for the mortgage, and whether it was paid in money or by check? says, Hezekiah Easton produced the mortgage of May 13th, 1856, for $15,000, and offered to sell the same for *thirteen thousand dollars*, stating he could well afford to make such a sacrifice, as he would certainly make twice as much by purchasing his endorsements before they became due, at the heavy discount at which they were offered, etc. The defendant agreed to purchase it at the price asked for it, provided when he should go to Baltimore he should find it a just incumbrance.

Further answering, he says, he proceeded to Baltimore

and made a satisfactory examination, etc., and when Hezekiah arrived a day or two afterwards, he announced to him that said examination was satisfactory, and he was prepared to pay the price of $13,000, at which he had offered it. The assignment was prepared and executed, and "this defendant thereupon wrote and signed and delivered to him a check upon the banking house of Johnston, Bro. & Co., of Baltimore, for $13,000.

"In answer to the enquiry as to what was the object or design for which said check was to be used, this defendant understood and believed it was intended to be used in anticipating the payment of the endorsements of said Hezekiah as aforesaid, and thus avail himself of the heavy discount at which they were offered, and this defendant is informed and believes, and perhaps was present and saw, the said Hezekiah endorse and deliver the said check to J. Philip Roman, then sojourning in Baltimore, to be used by him for such purpose from time to time as said notes might be offered."

The answer further shows, that a few days after returning to Hagerstown, the respondent was summoned to answer the original bill of the complainants, (the appellants,) and thereby being first informed the mortgage of the 13th May, 1856, was impeached for fraud in its inception, he wrote to J Philip Roman requesting him not to present the check, (if not already done,) or not to use the money until the validity of the mortgage could be further ascertained; a short time afterwards he met Hezekiah, much disappointed at the frustration of his plans, and although the defendant had scarcely a doubt of its validity, yet he declined to let the check be paid, and thus risk the uncertainty of a law suit.

Finally it was arranged that J. Philip Roman should, with his own money, purchase said endorsed notes, taking a judgment against the said Hezekiah in Pennsylvania, and holding the said check as collateral security.

The defendant agreed that whenever his right to the said mortgage should be established, the said check, with interest from its date, should be paid to J. Philip Roman, to be by him credited on said judgment. The respondent further says, he supposes said check has remained in possession of said J. Philip Roman ever since, and has not been presented or paid, and this defendant does not intend it shall be paid until his right to said mortgage shall be established.

A general replication was filed to these answers and a commission issued, under which the several exhibits filed with the bill, and a deposition of Hezekiah Easton, were filed and returned.

The testimony taken under the commission is exceedingly meagre upon the points which are controverted. The answers considered merely as pleadings, put the complainants upon the proof of all the allegations material to the relief prayed. It is conceded, that the consideration for the mortgage of the 13th May, 1856, was $15,000, actually advanced by the mortgagee to the mortgagor, and certain stocks, which were afterwards returned. No question, therefore, arises as to the relationship between the original parties to that instrument, but it is sought to affect the assignment by imputing *mala fides* to the assignee, and want of consideration actually paid *"ante litem motam."*

The answers of the assignee, although differing in circumstance, are not to be considered as involving such contradiction as to deprive them of their legal effect, in throwing the burden of proof upon the complainant. The first answer may be construed as stating the general result of the transactions between the assignor and assignee, when it avers, "that the defendant then and there finally and *bona fide* paid to him (the assignor) the full and fair valuation agreed upon, and took the assignment as purchaser and

placed it upon record." The second answer setting out the mode of payment, discloses the particulars by which that result was effected.

A check given *bona fide*, on a banker having funds to pay it, is *prima facie* payment in this State, if accepted as cash. The subsequent suspension of its payment, in consequence of the filing of the bill of the complainants, which assailed the original consideration of the mortgage, for which the check was given, did not cancel the check, but its payment was postponed by express agreement with the payee, until the validity of the first mortgage was established. In the meantime the check subserved the assignor's object, in constituting a collateral security for advancements made by another, who engaged to supply funds to be used for the same purposes as the check.

The brief interval between the assignment to J. Dixon Roman and the execution of the deed of trust to him by the Messrs. Eastons, is not alone sufficient to overcome the positive denial of the answers, that the trusteeship was not a part of the original arrangement, and contemplated at the time of the execution of the power. So, also, with regard to the intent to protect the property from attachment of the creditors of Hezekiah Easton, imputed by the bill, and expressly denied by the assignee, there being no evidence to overcome the answers, these allegations remain unproved.

There is not sufficient evidence to subject the assignee to the equitable liens which would have existed against the assignor, if the first mortgage had remained in his hands undisposed of for a valuable consideration.

The claim of the appellants to be substituted to the benefit of the indemnity given by the second mortgage, in priority to the first, as against the assignee, Roman, is not supported, in the judgment of a majority of this Court, by the authorities cited.

Woodville et al. *vs.* Reed et al.

How far an endorser, who takes a mortgage to indemnify himself as surety, waives his own lien upon the same property previously given, has not been decided by any case in this State. Several cases cited from our sister States, tend to establish that doctrine.

The substance of these is, that an endorser or surety holding a mortgage for his indemnity may, whilst solvent, for a *bona fide* consideration, assign the mortgage, but when insolvency ensues, the mortgagee's interest in the property is made to yield to the superior equity in favor of the creditors for whom he was surety. We are not disposed to extend the doctrine of equitable lien. In the view which we take of this case, the assignment was complete before the assignee was notified of the claims of the appellants, and the insolvency of the assignor was not established at the date of the assignment.

It results from these premises, that the orders of the Court below, allowing the claim of J. Dixon Roman, should be affirmed.

The claim of J. Philip Roman arises on certain notes of Reed, Easton & Co., endorsed by Hezekiah Easton, amounting to $19,023.13, including interest, purchased pending these proceedings and filed by the claimant as owner in his own right.

They are excepted to and resisted by the appellees in the second case, on the ground that they are a portion, or renewals of a portion, of the notes endorsed by Hezekiah Easton, which were designed to be protected by the mortgage of Levi Easton to him, and were purchased by J. Philip Roman as agent of Hezekiah, who being liable for their amount, is not entitled to dividends as a creditor.

By agreement of the solicitors, the answer of J. Dixon Roman to the supplemental bill is read as evidence, on the hearing of these exceptions, subject to all legal objections. The appellant, J. Philip Roman, denies all agency on

his part, and claims to be a purchaser for a *bona fide* consideration.

His counsel in sustaining this position, insists in his brief, that the only evidence in the record legally applicable to this controversy, is the answer of J. Dixon Roman and the testimony of the brokers, the former of which, he conceives to be in complete harmony with the statement of J. Philip Roman.

In a preceding part of this opinion, we have seen J. Dixon Roman's intimate connection with the affairs of Hezekiah Easton, and his ample opportunities of knowing his objects in assigning the mortgage of May, 1856.

Speaking of the design for which his check was to be used, he said "it was intended to be used in anticipating the endorsements of said Hezekiah as aforesaid, and thus avail himself of the heavy discount at which they were offered; and this defendant is informed and believes, or perhaps was present and saw, the said Hezekiah endorse and deliver the said check to J. Philip Roman, then sojourning in Baltimore, to be used by him for such purpose from time to time as the said notes might be offered."

This check was dated the 23rd of February, 1857, from which time it remained in J. Philip Roman's possession, to be used as indicated, until it was countermanded some two or three weeks afterwards. Thus, there was an agency established then by this arrangement. After the payment of the check was countermanded, other means were to be supplied to effect the object, when it was agreed "that J. Philip Roman should, with his own money, purchase said endorsed notes, taking a judgment against the said Hezekiah in Pennsylvania, and holding the said check as collateral security."

The final arrangement, by no means conflicts with the original purpose of the purchase for the benefit of Hezekiah Easton. On the contrary it confirms it; why should Heze-

kiah confess a judgment in favor of J. P. Roman for $20,000, and leave the check in his possession as collateral security, if the purchase of the notes was not on his account?

The theory of the claimant is, that Hezekiah Easton, hearing that the paper could not be paid by the makers at maturity, was extremely desirous that it should be retired from the hands of its then holders before its maturity, upon his being satisfactorily secured in its ultimate payment in full, and to that end did propose to the claimant, that he should acquire the paper and hold the same till the makers thereof could conveniently pay it, in consideration of which he, Hezekiah, agreed to give a judgment bond in Pennsylvania, and did assign to him the check, etc. This is entirely inconsistent with other facts established beyond all controversy.

The makers of the paper were according to the testimony utterly insolvent. There was no hope of indemnity from them. The paper was at a discount of fifty per cent., and there was no alternative for the endorser, beyond the security he had already received, except by purchasing the paper at the discount.

There can be no doubt the check for $13,000 was endorsed and delivered to the complainant with the understanding that he was to use it in purchasing the paper for Hezekiah Easton. When that was countermanded the judgment was substituted, with the retainer of the check as collateral, to indemnify the agent. This is the only deduction reconcilable with reason.

No inducement existed for the confession of judgment and deposit of the check, unless the arrangement originally founded on the latter for the purchase of the paper, on account of Hezekiah Easton, continued.

Would a debtor, whose paper was selling at one-half its nominal value, indemnify the purchaser, unless he partici-

Mayor & C. C. of Balto. vs. Horn et al.

pated in some manner in the benefit of the purchase?" The enormous profit resulting from the operation was sufficient compensation for the risk, even in the critical circumstances of the endorser, without his insuring the purchaser against loss for an outlay which in no manner benefitted him. The answer of the claimant is overcome by the weight of testimony and pregnant circumstances.

It follows from what has been said, that in the opinion of this Court, the orders of the Court below in the first case appealed from, ratifying the accounts allowing J. Dixon Roman the amount of the mortgage of the 13th of May, 1856, and the decrees and orders on which said accounts are based, must be affirmed with costs to the appellee in this Court; and so much of the order of the 11th of March, 1864, as rejects the allowance in said accounts to J. Philip Roman is affirmed, with costs as aforesaid to the appellees, and the cases are remanded for further proceedings.

*Orders affirmed and cases remanded.*